**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARIZONA LIBERTARIAN PARTY;
ARIZONA GREEN PARTY; JAMES
MARCH; KENT SOLBERG; STEVE
LACKEY,

        *Plaintiffs-Appellants*,

v.

MICHELE REAGAN, Secretary of
State,

        *Defendant-Appellee.*

No. 13-16254

DC No.
4:11 cv-0856
CKJ

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Arizona
Cindy K. Jorgenson, District Judge, Presiding

Argued and Submitted
January 29, 2015—University of Arizona, James E. Rogers
College of Law, Tucson, Arizona

Filed April 24, 2015
Amended August 7, 2015

Before: A. Wallace Tashima, M. Margaret McKeown,
and Marsha S. Berzon, Circuit Judges.

Order;
Opinion by Judge Tashima;
Concurrence by Judge McKeown

## SUMMARY[*]

### Civil Rights

The panel affirmed the district court's summary judgment in an action brought by the Arizona Green Party, the Arizona Libertarian Party, and three of their members alleging that Arizona's voter registration form violates their First and Fourteenth Amendment rights.

In 2011, the Arizona Legislature enacted a law requiring the voter registration form distributed by the Arizona Secretary of State to list the two largest parties (as measured by number of registered voters) on the form, as well as provide a blank line for "other party preferences." See Ariz. Rev. Stat. § 16-152(A)(5). Prior to the 2011 amendment, Arizona law required only that voter registration forms include a blank space for the registrant's party preference.

The panel first determined that plaintiffs failed to adduce evidence that the revised registration form actually discourages or prevents voters from registering with minor parties. The panel held that at most, § 16-152(A)(5) imposes a *de minimis* burden on plaintiffs' First and Fourteenth Amendment rights. The panel then concluded that plaintiffs failed to meet their burden of demonstrating that § 16-152(A)(5) is not rationally related to a legitimate state interest. The panel held that § 16-152(A)(5) helps to ensure that election officials will easily be able to determine the preferred party for most of Arizona's voters in a manner that

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the State has deemed to be cost efficient and less prone to clerical error.

Concurring, Judge McKeown agreed that Arizona's voter registration form passes constitutional muster. She wrote separately because she believes the rational basis review and burden-shifting standards articulated in *Libertarian Party of Washington v. Munro*, 31 F.3d 759 (9th Cir. 1994), and applied by the panel in this case, are inconsistent with the Supreme Court's approach to analyzing voting rights challenges.

## COUNSEL

David T. Hardy, Tucson, Arizona, for Plaintiffs-Appellants.

Thomas C. Horne, Attorney General of Arizona, Robert L. Ellman, Deputy Attorney General (argued), Michele L. Forney and Todd M. Allison, Assistant Attorneys General, Phoenix, Arizona, for Defendant-Appellant.

## ORDER

The opinion filed April 24, 2015, and reported at 784 F.3d 611, is amended by adding at the end of the carryover paragraph from page 16, slip op. at 17, 784 F.3d at 621, left-hand column, end of carryover paragraph from page 620, a new footnote 12, as follows:

> [12] We apply *Munro* because it is binding on us and addresses situations, like this one, in which the burden, if it exists at all, is

vanishingly small. We note, however, that *Munro*'s statements that we may consider hypothetical rationales for a state's election law, and that the plaintiff alleging a *de minimis* burden must demonstrate the *lack* of a rationale basis, are in tension with some of our other cases and Supreme Court precedent. *See, e.g.*, *Burdick*, 504 U.S. at 434; *Dudum*, 640 F.3d at 1106, 1113–14. We need not resolve that tension, however, because even under the balancing of interests and burdens analysis, we would nonetheless reject this challenge. First, as noted above, Plaintiffs failed to adduce evidence of *any* burden at all; absent *any* burden, there is no reason to call on the State to justify its practice. At most, Plaintiffs established a burden on those wishing to register with a third party, limited to writing a word rather than checking a box – assuredly not an infringement of constitutional dimension. Second, the State's rationale, which we below hold justifies this law, is not hypothetical or manufactured by the court, having been specifically articulated in its brief on appeal. Third, even if the State bears the ultimate burden of persuasion with regard to the justification of this law, we are persuaded, given the very slight burden involved, that it survives constitutional scrutiny.

The footnotes following new footnote 12 are accordingly renumbered.

The amended opinion and the amended concurrence are filed concurrently with this order.

With the above amendments, Judges McKeown and Berzon vote to deny the petition for rehearing en banc and Judge Tashima so recommends.  The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on en banc rehearing.  *See* Fed. R. App. P. 35(f).  The petition for rehearing en banc is denied.  No further petitions for rehearing/rehearing en banc will be entertained.

---

**OPINION**

TASHIMA, Circuit Judge:

In 2011, the Arizona Legislature enacted a law requiring the voter registration form distributed by the Arizona Secretary of State to list the two largest parties (as measured by number of registered voters) on the form, as well as provide a blank line for "other party preferences."  The Arizona Green Party, Arizona Libertarian Party, and three of their members (together, "Plaintiffs") brought this action, alleging that the new voter registration form violated their First and Fourteenth Amendment rights.  The district court concluded that the amended voter registration form survived constitutional scrutiny and granted the State's motion for summary judgment.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I.

**A. Section 16-152(A)(5) and the Registration Form**

In 2011, the Arizona Legislature amended the statute that dictates the content of the voter registration form provided by the State (the "Registration Form"). *See* 2011 Ariz. Legis. Serv. Ch. 339 § 1 (West) (codified at Ariz. Rev. Stat. § 16-152(A)). The amended statute provides, in relevant part:

> A. The form used for registration of electors shall contain:
>
> . . .
>
> 5. The registrant's party preference. The two largest political parties that are entitled to continued representation on the ballot shall be listed on the form in the order determined by calculating which party has the highest number of registered voters at the close of registration for the most recent general election for governor, then the second highest. The form shall allow the registrant to circle, check or otherwise mark the party preference and shall include a blank line for other party preference options.

Ariz. Rev. Stat. § 16-152(A)(5). Prior to the 2011 amendment, Arizona law required only that voter registration forms include a blank space for "[t]he registrant's party preference." *See* Ariz. Rev. Stat. § 16-152(A)(5) (2010). As of January 1, 2011, the two parties with the highest number of registered voters in Arizona were the Republican Party,

with approximately 35.8 percent, and the Democratic Party, with approximately 31.6 percent. The next largest party was the Libertarian Party, with approximately 0.78 percent of registered voters.[1]

In response to the amendment, the Arizona Secretary of State revised box 14 on the Registration Form. In its current form, box 14 appears as follows:

The blank line under the "Other" checkbox is approximately 0.9 inch long. The Registration Form also provides the following instructions regarding box 14:

> Fill in your political party preference in box 14. If you leave this box blank as a first time registrant in your county, your party preference will be "Party Not Designated." If you leave this box blank and you are already registered in the county, your current party

---

[1] Although the exact percentage of voters registered with each party has fluctuated slightly since January 1, 2011, the Republican and Democratic Parties have remained the two parties with the highest number of registered voters.

preference will be retained.  Please write full
name of party preference in box.

## B.  Arizona's Voter Registration Scheme

Under Arizona law, qualified electors[2] may register to
vote in one of three ways:

1.  They may obtain, fill out, and mail in the Registration
    Form, which can be downloaded from the Secretary
    of State's website or picked up from either the
    Secretary of State's office or any local county
    recorder's office, *see* Ariz. Rev. Stat. § 16-151;

2.  They may submit an online voter registration
    application using the "EZ Voter Registration"
    process, available at the Arizona Department of
    Transportation's service website, *see* Ariz. Rev. Stat.
    § 16-112(B)(4); *see also* Ariz. Dep't of Transp.
    Motor Vehicle Div., Service Arizona,
    http://www.servicearizona.com (last visited Jan. 7,
    2015);[3] or,

3.  They may register in person at Arizona Motor Vehicle
    Division offices by filling out a section provided on

---

[2] Arizona law sets forth certain criteria that make a resident of the state
a "qualified elector."  *See* Ariz. Rev. Stat. §§ 16-101, 16-121.

[3] We may take judicial notice of "official information posted on a
governmental website, the accuracy of which [is] undisputed." *Dudum v.
Arntz*, 640 F.3d 1098, 1101 n.6 (9th Cir. 2011) (citing *Daniels-Hall v.
Nat'l Educ. Ass'n*, 629 F.3d 998–99 (9th Cir. 2010)).

the form for a driver's license or renewal for individuals who want to register to vote.

Section 16-152(A)(5) applies *only* to the first of these three options – that is, only the Secretary of State is required to provide checkboxes for the two largest parties on the Registration Form.  *See* Ariz. Rev. Stat. § 16-152(E) (providing that the content regulations set forth in § 16-152(A) "do[] not apply to registrations received from the department of transportation").  Like the Secretary of State's form before the amendment to § 16-152(A)(5), the second and third options allow a registrant to indicate party preference by entering any party's name, including a major party.[4]

## C.  Arizona's Ballot Access Laws

Under Arizona law, there are two ways for a party to get its preferred candidate on the ballot.[5]  First, a "new political party" becomes "eligible for recognition" upon filing a petition with the Secretary of State signed by a number of qualified electors equal to one and one-third (1⅓) percent "of

---

[4] In addition, "[t]he National Voter Registration Act requires States to 'accept and use' a uniform federal form to register voters in federal elections. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247, 2251 (2013).  The federal form, like the second and third Arizona options described above, permits a voter to indicate a political party of choice, but does not include checkboxes for the two largest political parties. *See* U.S. Election Assistance Commission, National Mail Voter Registration Form, http://www.eac.gov/assets/1/Documents/Federal%20Voter%20 Registration_6-25-14_ENG.pdf (last visited Mar. 20, 2015).

[5] Arizona law also permits individuals who are not members of political parties to qualify for the ballot if they comply with certain criteria. *See* Ariz. Rev. Stat. § 16-341.

the total votes cast for governor at the last preceding general election at which a governor was elected." Ariz. Rev. Stat. § 16-801(A). Recognition entitles a new political party to be "represented by an official party ballot at the primary election and accorded a ballot column at the succeeding general election" through at least "the next two regularly scheduled general elections for federal office immediately following recognition of the political party." Ariz. Rev. Stat. § 16-801(B).

After these first two federal election cycles, a party may continue to be represented by an official party ballot during a primary election and accorded a ballot column in the succeeding general election (that is, the party is entitled to "continuing ballot access") in one of two ways. First, a party is entitled to continuing ballot access if its candidate receives "not less than five per cent of the total votes cast for governor or presidential electors" at the "last preceding general election" for certain specified offices. Ariz. Rev. Stat. § 16-804(A). Second, a party is entitled to continuing ballot access if, on certain dates prescribed by statute, the party "has registered electors in the party equal to at least two-thirds of one per cent of the total registered electors in such jurisdiction." Ariz. Rev. Stat. § 16-804(B). A party that loses continuing ballot access may get it back the same way a new party would gain access to the ballot: it must submit another petition signed by a number of qualified electors equal to one and one-third (1⅓) percent of the total votes cast for governor at the last preceding general election at which a governor was elected. *See* Ariz. Rev. Stat. § 16-801(B).

When Plaintiffs filed their complaint, five parties had continuing ballot access: Republican, Democratic, Green, Libertarian, and Americans Elect. During the pendency of

this appeal, the Arizona Green Party lost its continuing ballot access.[6]

## D.  Procedural History

Plaintiffs' complaint, filed against defendant Ken Bennett, as Arizona Secretary of State, alleges that § 16-152(A)(5) violated their First and Fourteenth Amendment rights. Plaintiffs sought an order from the district court enjoining the State from issuing voter registration forms that failed to "treat equally the four parties with Statewide continuing ballot access."   On the parties' cross-motions for summary judgment, the district court denied Plaintiffs' motion and granted the State's motion.  Plaintiffs timely appeal.

## II.

This Court reviews the constitutionality of a statute *de novo*.  *See Chamness v. Bowen*, 722 F.3d 1110, 1116 (9th Cir. 2013).

## III.

## A.  The   Framework   for   Resolving   Constitutional Challenges to State Election Laws

"Restrictions on voting can burden equal protection rights as well as 'interwoven strands of liberty' protected by the First and Fourteenth Amendments—namely, the 'right of individuals to associate for the advancement of political

---

[6] At oral argument counsel for appellants informed the court that the Green Party has again qualified for continuing ballot access by submitting a petition with a sufficient number of signatures.

beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.'" *Dudum*, 640 F.3d at 1105–06 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983) (some internal quotation marks omitted)).[7]    As the Supreme Court has recognized, these rights are generally guaranteed by ensuring that political parties, including those that are new to the political scene, are given the opportunity to place their candidate on the ballot. *See Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) ("The freedom to associate as a political party . . . has diminished practical value if the party can be kept off the ballot.").    Indeed, because "an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying-point for like-minded citizens," *Anderson*, 460 U.S. at 788, "the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot." *Williams v. Rhodes*, 393 U.S. 23, 31 (1968).

"At the same time," however, "'States retain the power to regulate their own elections.'" *Dudum*, 640 F.3d at 1106 (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections." *Id.* at 1103 (quoting *Burdick*, 504 U.S at 433).    The Constitution itself "provides that States may prescribe 'the Times, Places and Manner of holding Elections for Senators and Representatives.'" *Burdick*, 504 U.S. at 433

---

[7] Although Plaintiffs assert both First and Fourteenth Amendment claims, "[t]he Supreme Court has addressed such claims collectively using a single analytic framework." *Dudum*, 640 F.3d at 1106 n.15.    Plaintiffs agree that this "single analytic framework" applies here.

(quoting U.S. Const. art. I, § 4, cl. 1 (brackets omitted)). And, "[t]o achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes." *Anderson*, 460 U.S. at 788. Moreover, *every* law regulating elections, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Id.*

Thus, in order to "resolve the tension between a [party's] First Amendment rights and the state's interest in preserving the fairness and integrity of the voting process," the "Supreme Court developed a balancing test." *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1014 (9th Cir. 2002). "In considering a constitutional challenge to an election law, we must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Nader v. Cronin*, 620 F.3d 1214, 1217 (9th Cir. 2010) (per curiam) (internal quotation marks omitted).

Accordingly, "the severity of the burden the election law imposes on the plaintiff's rights dictates the level of scrutiny applied by the court." *Id.* (quoting *Nader v. Brewer*, 531 F.3d 1028, 1034 (9th Cir. 2008) (internal quotation marks omitted)); *see also Burdick*, 504 U.S. at 434 ("[T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights."). "An election regulation that imposes a severe burden is subject to strict scrutiny and will be upheld only if it is narrowly tailored to serve a compelling state interest."

*Cronin*, 620 F.3d at 1217 (quoting *Brewer*, 531 F.3d at 1035 (internal quotation marks and brackets omitted)).  By contrast, "[a] state may justify election regulations imposing a lesser burden by demonstrating the state has 'important regulatory interests.'"  *Id.* (quoting *Brewer*, 531 F.3d at 1035).

## B. Section 16-152(A) Imposes a *De Minimis* Burden on Plaintiffs' Constitutional Rights

In cases "previously examining differing treatments of minor and major political parties," we have held that, "in determining the nature and magnitude of the burden that the state's election procedures impose on the minor party, we must examine the entire scheme regulating ballot access." *Cronin*, 620 F.3d at 1217 (quoting *Libertarian Party of Wash. v. Munro*, 31 F.3d 759, 761–62 (9th Cir. 1994) (internal quotation marks and brackets omitted)).[8]  The

---

[8] Plaintiffs urge us to forgo a severity-of-the-burden analysis, arguing that, because § 16-152(A)(5) differentiates between major and minor parties on its face, strict scrutiny automatically applies.  Plaintiffs' proposed bright-line rule is at odds with both Supreme Court precedent and our own.  Although the Supreme Court has expressed a generalized concern about laws that favor major parties over minor parties, *see, e.g.*, *Anderson*, 460 U.S. at 793 n. 16; *Clingman v. Beaver*, 544 U.S. 581, 603 (2005) (O'Connor, J., concurring in part and concurring in the judgment), it has only applied strict scrutiny to a state election law after determining that the law imposed a severe burden on a party's constitutional rights. *See, e.g.*, *Williams*, 393 U.S. at 25 n.1, 31.  Moreover, we have repeatedly refused to apply strict scrutiny to election laws that differentiate between major and minor parties, so long as the law at issue did not "severely burden" a minor party's constitutional rights.  *See, e.g.*, *Cronin*, 620 F.3d at 1217–18; *Munro*, 31 F.3d at 763.  Accordingly, we reject Plaintiffs' contention that strict scrutiny automatically applies to all state election laws that facially distinguish between major and minor parties.

relevant inquiry "is whether 'reasonably diligent' minor party candidates can normally gain a place on the ballot, or if instead they only rarely will succeed." *Munro*, 31 F.3d at 762 (quoting *Storer v. Brown*, 415 U.S. 724, 742 (1974)); *see also Anderson*, 460 U.S. at 787–88 (noting that the relevant inquiry in determining the constitutionality of election regulations is the ability of voters' preferred candidates to get on the ballot). Moreover, the party challenging the law bears "the initial burden of showing that [the state's] ballot access requirements seriously restrict the availability of political opportunity." *Munro*, 31 F.3d at 762.

Plaintiffs have failed to make any such showing. Section 16-152(A)(5) does not directly inhibit the ability of any party to gain access to the ballot, nor does it articulate different criteria for major and minor parties who seek to get their candidates on the ballot. All new political parties (and parties that have lost continuing ballot access) are required to comply with the same criteria to get their candidate on the ballot. *See* Ariz. Rev. Stat. § 16-801. Moreover, all political parties, major and minor alike, are entitled to continuing ballot access if: (1) their candidates garner at least five percent of the "total votes cast for governor or presidential electors" at the "last preceding general election" for certain specified offices; or, (2) they have "registered electors . . . equal to at least two-thirds of one per cent of the total registered electors" in the relevant jurisdiction by a specified date. Ariz. Rev. Stat. § 16-804.

Acknowledging that § 16-152(A)(5) does not directly burden their ability to get their preferred candidate on the ballot, Plaintiffs instead assert that the statute indirectly "restrict[s] the availability of political opportunity," *Munro*, 31 F.3d at 762, by encouraging voters to register with the two

major parties over all others.  This encouragement, Plaintiffs contend, affects their ability to get their preferred candidate on the ballot, because continuing ballot access is linked (at least partially) to the number of voters who are registered with the party.

Plaintiffs have failed, however, to adduce any evidence that § 16-152(A)(5) actually encourages individuals to register for major parties instead of minor ones.  As an initial matter, Plaintiffs have failed to show how many new voters actually use the Registration Form to register, as opposed to using one of the other three  alternative means, which do not require use of the Registration Form.   Without some assessment of how many voters actually use the Registration Form, we cannot even begin to gauge the impact it may have had on party registration rolls.

Moreover, even if we were to assume that a significant number of voters used the Registration Form, Plaintiffs failed to adduce *any* evidence – statistical, anecdotal, or  otherwise – that the Registration Form has, in fact, encouraged voters to register for the major parties over minor ones.  Plaintiffs suggest that the Registration Form discourages voters from registering with minor parties by sending "a message to the future voter" that there are only "two [*real*] political parties in this State," and that "[r]egistering for any other party is a show of eccentricity" that must be "grudgingly tolerate[d]." However, Plaintiffs failed to introduce even an iota of evidence in support of this assertion.   The alleged psychological effects that the Registration Form has on

registering voters is sheer speculation.[9]    Plaintiffs' other contention – that voters have been unable to register with the party of their choosing because the blank line below the word "Other" in box 14 is "too short to contain even the word 'Libertarian'" – is similarly unsupported by any evidence in the record.

In sum, by failing to adduce evidence that the Registration Form actually discourages or prevents voters from registering with minor parties, Plaintiffs have failed to meet their "initial burden of showing that [Arizona's] ballot access requirements seriously restrict the availability of political opportunity." *Munro*, 31 F.3d at 762.   At most, § 16-152(A)(5) imposes a *de minimis* burden on Plaintiffs' First and Fourteenth Amendment rights.

## C. Section 16-152(A)(5) is Rationally Related to a Legitimate State Interest

Where, as here, a state election law imposes only a *de minimis* burden on a party's First and Fourteenth Amendment rights, the State "need demonstrate only that [the statute at

---

[9] Both sides make much of a chart compiled by the State that details the number of qualified electors registered with the Republican, Democratic, Green, and Libertarian Parties, as well as an undefined "Other" category, at various points between January 1, 2011, and March 1, 2012.  These raw data do not, by themselves, allow us to draw reliable conclusions as to whether the Registration Form actually dissuaded new voters from registering with minor parties.  Party registration may ebb and flow for myriad reasons, including overall changes in the number of eligible voters, in voter mobilization activity, or in disaffection with the electoral process. Although a study isolating the effects that the Registration Form has had on party registration might allow a fact-finder reasonably to infer that the Registration Form has discouraged voters from registering with minor parties, Plaintiffs have presented no such evidence here.

issue] is rationally related to a legitimate state interest." *Cronin*, 620 F.3d at 1218 (quoting *Munro*, 31 F.3d at 763 (internal quotation marks omitted)).**10**   In evaluating the constitutionality of such statutes, we may "look to any conceivable interest promoted by the challenged procedures, whether or not the state cited that interest in its briefs or in the district court." *Munro*, 31 F.3d at 763; *see also Dudum*, 640 F.3d at 1116 n.28 (noting that, in sustaining an election law that did not impose a severe burden on constitutional rights, the Supreme Court in *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997), "expressly relied on a state interest admittedly not advanced in its briefs, but mentioned during oral argument").  Furthermore, we need not determine whether the interests served by § 16-152(A)(5) can be better served by other means:  as we recently concluded, "when a challenged rule imposes only limited burdens on the right to vote, there is no requirement that the rule is the only or the best way to further the proffered interests." *Dudum*, 640 F.3d at 1114.**11**   Finally, where, as here, the regulation at issue

---

**10** Alternatively, we have stated that, in cases in which an election law imposes a *de minimis* burden on constitutional rights, the challenged procedures "survive review as long as they further a state's *important regulatory interests*." *Wash. State Republican Party v. Wash. State Grange*, 676 F.3d 784, 793-94 (9th Cir. 2012) (internal quotation marks omitted) (emphasis added).  In this context, we have used the terms "legitimate" interests and "important regulatory" interests interchangeably.  *See Cronin*, 620 F.3d at 1217, 1218; *Dudum*, 640 F.3d at 1114, 1116.

**11** Although we have noted that there may be "instances where a burden is not severe enough to warrant strict scrutiny review but is serious enough to require an assessment of whether alternative methods would advance the proffered governmental interests," *Dudum*, 640 F.3d at 1114 n.27, for the reasons set forth above, it is clear that § 16-152(A)(5) does not impose

imposes only a slight burden on a party's constitutional rights, that party "bear[s] the burden of demonstrating that the regulations [it] attack[s] have no legitimate rational basis." *Munro*, 31 F.3d at 763.**[12]**

Plaintiffs have failed to meet their burden. Section 16-152(A)(5) is rationally related to Arizona's legitimate interest in ensuring that election official correctly register voters as members of parties of their choosing. By providing checkboxes for the two largest political parties, the Registration Form reduces the potential that an election official will incorrectly register a voter who wishes to affiliate with one of the state's two most prominent parties. Because

---

a serious enough burden on Plaintiffs' constitutional rights to mandate this kind of comparative analysis.

**[12]** We apply *Munro* because it is binding on us and addresses situations, like this one, in which the burden, if it exists at all, is vanishingly small. We note, however, that *Munro*'s statements that we may consider hypothetical rationales for a state's election law, and that the plaintiff alleging a *de minimis* burden must demonstrate the *lack* of a rational basis, are in tension with some of our other cases and Supreme Court precedent. *See, e.g.*, *Burdick*, 504 U.S. at 434; *Dudum*, 640 F.3d at 1106, 1113–14. We need not resolve that tension, however, because even under the balancing of interests and burdens analysis, we would nonetheless reject this challenge. First, as noted above, Plaintiffs failed to adduce evidence of *any* burden at all; absent *any* burden, there is no reason to call on the State to justify its practice. At most, Plaintiffs established a burden on those wishing to register with a third party, limited to writing a word rather than checking a box – assuredly not an infringement of constitutional dimension. Second, the State's rationale, which we below hold justifies this law, is not hypothetical or manufactured by the court, having been specifically articulated in its brief on appeal. Third, even if the State bears the ultimate burden of persuasion with regard to the justification of this law, we are persuaded, given the very slight burden involved, that it survives constitutional scrutiny.

the overwhelming majority of Arizona voters are registered with one of the two major parties, the checkbox method ensures that most voters will be able to participate in the primary election of their choosing.  *See* Ariz. Rev. Stat. § 16-467 (providing that, in primary elections, voters who are registered as a member of a political party shall be given "one ballot only of the party with which the voter is affiliated").  Ensuring that voters are able to participate in their preferred party's primary election is, at the very least, a legitimate state interest.  *See Kusper v. Pontikes*, 414 U.S. 51, 58 (1973) ("Under our political system, a basic function of a political party is to select the candidates for public office to be offered to the voters at general elections.  A prime objective of most voters in associating themselves with a particular party must surely be to gain a voice in that selection process.").

Although election officials also have an interest in correctly registering applicants who wish to associate with smaller political parties, there are, as the State notes, countervailing concerns about providing checkboxes for smaller political parties that are not present with the two largest parties.  For example, smaller political parties lose their status as recognized political parties under Arizona law much more frequently than the major parties do.  If Arizona was required to provide checkboxes for all political parties entitled to continuing ballot access, as Plaintiffs suggest, the State would be required to change, and reprint, the Registration Form each time a party lost, or gained, continuing ballot access.[13]   Thus, § 16-152(A)(5) helps to

---

[13] Indeed, just during the pendency of this appeal, the State would have had to alter and replace such a Registration Form when the Green Party lost its continuing ballot access, and change it again when the Green Party regained access.

ensure that election officials will easily be able to determine the preferred party for most of Arizona's voters in a manner that the State has deemed to be cost efficient and less prone to clerical error. This cost-benefit analysis is the kind of judgment that the Legislature was entitled to make. *See Munro*, 31 F.3d at 764 ("[B]ecause the current scheme poses only a minuscule burden for minor party candidacies, the Constitution does not require [the state] to adopt a system that is the most efficient possible; it need only adopt a system that is rationally related to achieving its goals."); *Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008) (upholding Oregon's system for verifying that individuals who signed a referendum because it reduced the state's administrative burden); *Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) (concluding that a state has a legitimate interest in saving money).[14]

## IV.

In sum, we conclude that Plaintiffs have failed to meet their burden of demonstrating that § 16-152(A)(5) is not rationally related to a legitimate state interest. Accordingly, the judgment of the district court is

**AFFIRMED.**

---

[14] The State also argues that § 16-152(A)(5) serves its interest of "maintaining the stability of Arizona's political system through a healthy two-party system." In light of our conclusion that § 16-152(A)(5) is rationally related to the State's legitimate interest in efficiently and accurately determining most voters' registration preference, we do not address this assertion.

Judge McKEOWN, Circuit Judge, concurring:

I concur in the panel's judgment: Arizona's voter registration form passes constitutional muster. I write separately because I believe the rational basis review and burden-shifting standards articulated in *Libertarian Party of Washington v. Munro*, 31 F.3d 759 (9th Cir. 1994), and applied by the panel in this case, are inconsistent with the Supreme Court's approach to analyzing voting rights challenges.

The majority opinion discusses at length how political parties in Arizona gain access to the ballot and states that "[t]he relevant inquiry 'is whether "reasonably diligent" minor party candidates can normally gain a place on the ballot . . . .'" Maj. Op. at 14–15 (quoting *Munro*, 31 F.3d at 762). But this is not a ballot access case. This case focuses instead on the state's voter registration process, specifically the form that lists only the two major political parties and simply leaves a blank for a prospective voter to identify any other party. This is, of course, a change from the prior voter registration form that identified no specific parties and simply provided a write-in line for party preference. The essence of the minority parties' claim is that they are burdened because the revised form advantages the major parties. By not being listed, the minority parties claim they are unable to compete for voter registrations on an equal footing.[1]

---

[1] In *Anderson v. Celebrezze*, the Supreme Court explicitly recognized that state "schemes . . . govern[ing] the registration and qualification of voters" can burden "the individual's right to vote and his right to associate with others for political ends." 460 U.S. 780, 788 (1983). For example, it would surely be unconstitutional for a state to sponsor voter registration drives at Republican Party events, while refusing to do so at comparable

The starting point for analyzing an election law challenge is the Supreme Court's opinion in *Burdick v. Takushi*, 504 U.S. 428 (1992). The Court succinctly stated the applicable standard: "A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* at 434 (internal quotation marks and citations omitted).

In *Munro*, we summarized *Burdick* as follows: "If the burden is severe, the challenged procedures will pass muster only if they are narrowly tailored to achieve a compelling state interest. If the burden is slight, the procedures will survive review as long as they have a rational basis." 31 F.3d at 761 (citing, but not quoting, *Burdick*, 504 U.S. at 434). According to *Munro*, in the event plaintiffs can only demonstrate a "slight" or "*de minimis*" impairment of their rights, they then bear "the burden of demonstrating that the regulations they attack have no legitimate rational basis." *Id.* at 763. The panel recognizes that the standard articulated in *Munro* is in tension with Supreme Court precedent, but applies it nonetheless. Maj. Op. at 18–19 & n.12.

Neither rational basis review nor the burden-shifting framework articulated in *Munro* is found in *Burdick*, nor in any other Supreme Court voting rights decision since. The Supreme Court has consistently employed language that

---

Democratic gatherings. The tacit encouragement alleged by the minority parties here is of the same character, but of a different magnitude.

rejects traditional rational basis review. In *Crawford v. Marion County Election Board*, 553 U.S. 181 (2008), for example, the Court wrote that there is no "litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters. However slight that burden may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Id.* at 191 (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)).

This understanding of the Supreme Court's approach to analyzing voting rights cases is faithfully reflected in our recent decision in *Dudum v. Arntz*, 640 F.3d 1098 (9th Cir. 2011). There, we concluded that San Francisco's instant runoff voting system imposed an "extremely limited burden[]" on the plaintiffs. *Id.* at 1117. We nonetheless evaluated whether the government's purported interests were "substantial enough to justify" that minimal burden. *Id.* at 1114–17. This language can be read as a variation on the "sufficiently weighty" requirement. Other cases have likewise eschewed resort to traditional rational basis analysis when evaluating the constitutionality of laws that impose "nonsevere burdens" on voting rights. *See, e.g.*, *Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir.2008) (upholding regulation imposing a "minimal burden on plaintiffs' rights" with respect to signature verification in the referendum process); *Rubin v. City of Santa Monica*, 308 F.3d 1008, 1017 (9th Cir. 2002) (weighing the government's "important regulatory interest in predictable and administrable election rules" against challenge to regulation on how candidates are identified on the ballot). Indeed, neither party in this case argued that rational basis review was the appropriate standard for analyzing the minority parties' claims.

*Munro*, like the majority opinion, suffers another deficiency—it places the burden on the plaintiffs vis-a-vis the state's purported interests. In a situation where there is only a slight burden on a party's constitutional rights, *Munro* instructs that that party "bear[s] the burden of demonstrating that the regulations [it] attack[s] have no legitimate rational basis." 31 F.3d at 763. This turns *Burdick*'s balancing standard on its head and relieves the state of its burden of putting forward "interests 'sufficiently weighty to justify the limitation.'" *Crawford*, 553 U.S. at 191 (quoting *Norman*, 502 U.S. at 288–89). It is no accident that in introducing the balancing standard, the Court counseled lower courts that they "must weigh the character and magnitude" of plaintiffs' asserted injury "against the precise interests put forward by the State." *Burdick*, 504 U.S. at 434 (internal quotation marks omitted).

It may well be that the semantic distinction between the balancing test and the rational basis standard articulated in *Munro* makes little difference in many cases. *See* Christopher S. Elmendorf, *Structuring Judicial Review of Electoral Mechanics: Explanations and Opportunities*, 156 U. Pa. L. Rev. 313, 330 (2007) ("For now, suffice it to say that the Supreme Court typically applies something like rational basis review in [voting rights cases where the burden is nonsevere], but that the rationality standard may not be quite so lax as the one applied to ordinary economic and social legislation."). However, it is difficult to believe that the Supreme Court's articulation of the balancing standard represents anything other than a deliberate choice to eschew traditional rational basis review. The balancing standard instructs courts to be vigilant in their review of rules and regulations that disadvantage minority viewpoints. *See Anderson*, 460 U.S. at 793 (1983) ("[I]t is especially difficult for the State to

justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status."). The balancing principle also recognizes that voting laws that at first glance appear to be inconsequential may unfairly distort election outcomes. *See, e.g.*, *Gould v. Grubb*, 536 P.2d 1337, 1346 (Cal. 1975) (holding that it is unconstitutional for a ballot to list candidates in alphabetical order because it "reserves advantageous ballot positions for candidates whose names begin with letters occurring early in the alphabet").

Any effort to apply the balancing standard to this case is hamstrung by a lack of evidence. It is remarkable that both parties rely principally on generalizations, i.e. a claimed burden, or platitudes, i.e. efficiency, rather than evidence. Other than the registration form itself and statistics that show an ambiguous decline in voter registrations across all political parties, the minority parties have not presented any evidence that demonstrates the burden on their rights.[2]  Likewise, the state has not even attempted to document the administrative benefits of its voter registration form. Without any evidence regarding the practical consequences of the voter registration

---

[2] The majority states not only that the burden imposed by the voter registration form is "*de minimis*," but also that it is "assuredly not an infringement of constitutional dimension."  Maj. Op. at 19 n.12.  I disagree.  In the ballot context, the Supreme Court has specifically recognized the burden imposed by requiring voters to write a word rather than to check a box. *Lubin v. Panish*, 415 U.S. 709, 719 n.5. ("The realities of the electoral process, however, strongly suggest that 'access' via write-in votes falls far short of access in terms of having the name of the candidate on the ballot.").  It would be more accurate to state that any burden is slight, not that it lacks a "constitutional dimension."

form, we find ourselves in the position of Lady Justice: blindfolded and stuck holding empty scales.

In light of the poorly developed record in this case, I conclude that the voter registration form passes constitutional muster.  The form is constitutional, however, not because the minority parties have "failed to meet their burden" of demonstrating it "ha[s] no legitimate rational basis," Maj. Op. at 19.  Rather, the voter registration form is constitutional because, even on the thin record we have before us, the state's asserted interests in reducing printing costs and easing administrative efficiency are "sufficiently weighty to justify" the speculative burden on the plaintiffs' rights.  *See Crawford*, 553 U.S. at 191.

I recognize that *Munro* has never been officially overruled or abrogated.  However, in my view, to the extent *Munro* prescribes a different standard than what the Supreme Court articulated in *Burdick* and reiterated in *Crawford*, we should fix it.