LAURA DENVIR STITH, JUDGE,
DISSENTING
I concur in the principal opinion’s holding that Ms. Johns does not state a First Amendment claim for violation of her free speech rights. I disagree with the principal opinion’s determination that Ms. Johns does not state a claim for violation of her First and Fourteenth Amendment'rights and the rights of voters in her district to vote for a candidate of their choice in' the upcoming election.
I. Missouri’s Two-Year Durational Voter Registration Requirement Is Invalid because it Places an Unnecessary and Substantial Burden on Ms. Johns and Voters

A. A Multi-Factor Test Must be Used to Determine Whether a Law Imposes a Substantial Burden on the Rights of Voters and on Ms, Johns

Ms. Johns correctly notes that the Supreme Court has held that restrictions on the right to run for public office implicate not only a potential candidate’s right to seek government office, but also “‘burden! ] • • • the right of qualified voters, regardless of their political persuasion; to cast their votes effectively. Both of these rights, of course, rank among our most precious- freedoms.’ ” Anderson v. Celebrezze, 460 U.S. 780, 787, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), citing, Williams v. Rhodes, 393 U.S. 23, 30-31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). “[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters.”- Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). “[Tjhese rights of voters are fundamental.” Celebrezze, 460 U.S. at 788; 103 S.Ct. 1564. “[Vjoting is of the most fundamental significance under our constitutional structure.” Burdick v. Takushi, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).
The Supreme Court has described the process this Court must use when evaluating challenges to election laws as follows:
Constitutional challenges to specific provisions of a State’s election laws therefore cannot be resolved by any “litmus-paper test” that will separate' valid from invalid restrictions. Instead, a court must .. / first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.' It then must identify and evaluate the precise interests put forward by the State as justifications for the burden .imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it nec *279 essary to burden the plaintiffs rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.
Celebrezze, 460 U.S. at 789, 108 S.Ct. 1564 (emphasis added).
In other words, a court cannot simply do what the majority does here and consider in the abstract whether it believes that a two-year delay in the right to run for office imposes a substantial burden on the rights of would-be candidates and voters, or whether instead such a burden, because not permanent, is inherently de minimus. Such an approach to the analysis is incomplete. Rather, in all cases alleging an election restriction is constitutionally invalid a court must weigh the burden in context by considering all three factors set out in Celebrezze before determining whether the burden is sufficiently substantial to require strict scrutiny or sufficiently de minimus in context so that rational basis scrutiny is permissible.
This means that first, this Court must' identify “the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.” Id. (Emphasis added). The Court cannot stop there, however. It, then, must continue its analysis so it can “identify and evaluate the precise interest put forward by the State as justifications for the burden imposed by its rule ... [and] determine the legitimacy and strength of each of those interests-” Id. (Emphasis added). Finally, in assessing the legitimacy and strength of the State’s interest, this Court must also “consider the extent to which those interests make it necessary to burden the plaintiffs rights.” Id. (Emphasis added).
In other words, the substantiality of the burden depends on the strength and legitimacy of the State’s interests, and whether it is necessary to burden plaintiffs rights to achieve these interests. If the interest is minimal or the necessity of imposing the burden questionable, then the burden is more likely to be substantial than where the interest protected is high and its connection to and the necessity for the burden to protect that interest is great. Only after undertaking this analysis will a court be in the position to determine whether to apply strict or rational basis scrutiny, and only then will a court be in a position to determine whether that restriction is constitutional. Id.
In Bullock, the Supreme Court undertook this analysis and determined that, while barriers to voting do not automatically require the use of strict scrutiny, they did in that case because the high filing fees at issue there would as a practical matter exclude many candidates from running for office and would substantially limit the voters’ choice of candidates. 405 U.S. at 143-44, 92 S.Ct. 849. Bullock therefore applied strict scrutiny, and struck down the filing fee laws.
Similarly, here, to determine whether strict scrutiny will apply, this Court must “examine in a realistic light the extent and nature” of the impact of the durational voter registration requirement on voters. Id. at 143, 92 S.Ct. 849. “[T]he severity of the burden the election law imposes on the plaintiffs rights dictates the level of scrutiny applied.... ” Arizona Libertarian Party v. Reagan, 798 F.3d 723, 729 (9th Cir. 2015). If that burden is severe, strict scrutiny applies, which means that “any severe restriction [must] be narrowly drawn to advance a state interest of compelling importance.” Norman v. Reed, 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992). If the burden is de minimis, rational basis review applies, and the restriction will be stricken-.down if arbitrary *280 and not rationally related to the state’s identified purpose. Arizona Libertarian Party, 798 F.3d at 729.
Application of the Celebrezze factors to the current facts demonstrates that the burden on Ms. Johns and on the voters is far greater than acknowledged by the majority, the interests the State gives as justification for its implementation do not outweigh this burden and the burden is not necessary to effectuate those interests. Therefore, strict scrutiny applies.

B. The Two-Year Voter Registration Requirement Imposes a Substantial Burden

The majority opinion, like the Respondent, asserts that because the two-year voter registration requirement lasts, by definition, “only” two years, it should be considered merely a “temporary” hurdle to running for office and so inherently is not substantial. Ms. Johns can simply wait until the next election to run for office, they say, and what difference will two more years make?
Of course, every durational voter registration requirement merely delays rather than forever bars a candidate from running for office. If this were a sufficient basis in itself to hold that the burden imposed by such durational voter registration requirements were not substantial, then no durational restriction would ever be subjected to strict scrutiny, for a time-based limitation is, inherently, limited in time. No court, prior to today, has suggested that a state has such a carte blanche to impose temporal registration restrictions on who may run for office. To the contrary, as just discussed, a multi-factor weighing process must be undertaken, for which the mantra of “temporary burden” is not an adequate substitute.
Moreover, the description of the burden as only causing a two-year delay in running for office is not accurate. The statute does require that one who runs for office must have been registered for two years, but that actually results in far more than a two year delay in seeking office where, as here, the office the challenger seeks to hold is one that requires re-election every two years. That is because even if a potential challenger registered to vote the week after the 2014 election, that person would not be able to meet the two-year registration requirement for running in the 2016 election. The challenger would have to wait until 2018 to run. That is nearly what occurred here, for Ms. Johns registered to vote a mere three months after the 2014 election, but that was not soon enough. She will have had to wait some 45 months before she can be elected to office should the voters wish to choose her as their state representative, a substantial burden on her right to run for office and on the right of voters to vote for her.
The Fifth Circuit addressed a very similar issue involving the validity of a three-year voter registration requirement to run for school board in Henderson v. Ft. Worth Indep. Sch. Dist., 526 F.2d 286 (5th Cir. 1976). If such “temporary” delays in running for office were inherently de mini-mus, as the majority here holds, then the Fifth Circuit’s analysis would have been short and swift; it would have said that a mere three-year delay is not substantial because it imposes only a temporary delay and, therefore, is subject only to rational basis review. This is not what the Fifth Circuit did, however. Instead, it undertook the type of analysis required by Cele-brezze and that I implore this Court to undertake here.
Applying this more appropriate analysis, the Fifth Circuit held the operative factor in determining whether a burden is substantial was not that the restriction de *281 layed candidacies only for a three-year period, but rather that during those three years the restriction created a bar that was “absolute in its operation” for those who had not registered three years in advance. Id. at 291-92. For this reason, “[the restriction] denies access to what must be assumed is a significant number of potential school board candidates, and on that basis the statute’s impact on voters is substantial.” Id. at 292 (emphasis added). Henderson went on to invalidate the restriction as not sufficiently related to the purposes identified to justify this substantial burden. Id.
It -is not surprising that Henderson reached this result, for in other contexts the United States Supreme Court has recognized that burdens on the exercise of rights resulting from statutes imposing temporal limitations do impose substantial burdens. For instance, Shapiro v. Thompson, 394 U.S. 618, 627, 638, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), overruled on other grounds by Edelman v. Jordan, 415 U.S. 651, 670-71, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), held that a one-year residency requirement before being eligible for welfare assistance in the District of Columbia violated the equal protection clause. Similarly, Memorial Hosp. v. Maricopa Cnty., 415 U.S. 250, 251, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), struck down a one-year residency requirement as a condition to receiving nonemergency hospitalization or medical care at the county’s expense as a violation of the equal protection clause. Although the latter two cases were decided based on the burden imposed on different rights than are at issue in the case at hand today, they show the flaws in the reasoning used by the majority to uphold the voter registration requirement in this case — that the restriction is only for two years, and such, a temporary delay in being allowed to assert ones rights inherently does not impose a substantial burden.
To the contrary, simply because the burden a restriction imposes is temporary does not end our inquiry. This Court still must look at the effect the durational requirement has .on the rights of Ms. Johns and voters and weigh that against the interests of the State:
The two cases relied on by the majority to support its contrary reasoning that temporarily delaying candidates from running for office only poses a “slight burden” on candidates and' voters — Clements v. Fashing, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982), and Stiles v. Blunt, 912 F.2d 260 (8th Cir. 1990) — are not on point. In Clements, the Supreme Court upheld a Texas statute requiring a sitting justice of the peace to complete his term before being eligible to run for á legislative seat because it was reasonable to require a current office holder to finish his term before running for a new office. For this reason, “[i]n establishing a maximum ‘waiting period’ of two years for candidacy by a Justice of the Peace for legislature, [the statute] places a de minimis burden on the political aspirations of a current office holder.” 457 U.S. at 967, 102 S.Ct. 2836 (emphasis in original). Furthermore, the substantial interest that Texas sought to vindicate in restricting sitting justices of the peace from running in legislative races in Clements has no application here. In Clements, the legitimate concern was raised that:
The demands of a political campaign may tempt a Justice of the Peace to devote less than his full time and energies to the responsibilities of his office. A campaigning Justice of the Peace might be tempted to render decisions and take actions that might serve more to further his political ambitions than the responsibilities of his office. The State’s interests are especially important *282 with regard to judicial officers. It is a serious accusation to charge a judicial officer with making a politically motivated decision.
Id. at 968, 102 S.Ct. 2836. Here, of course, Ms. Johns is not a current officeholder, nor is there any indication she has ever held office, nor can she hold elective office as a state representative until at least 2018 under the current scheme.
Stiles, similarly, is distinguishable. In Stiles, the Eighth Circuit upheld a requirement that a person running for state representative must be 24 years old. 912 F.2d at 266-66. Of course, as all people do grow older, their being any particular age is “temporary,” as the Eighth Circuit noted. Id. at 266. The Eighth Circuit did not hold this was itself a sufficient basis, however, to uphold the age limitation on running for office. It went on to consider Celebrezze’s requirement that a court assess the strength and legitimacy of the State’s interest and compare it with the right being temporarily restricted. In Stiles, these interests were rather clear: Missouri has an interest in having candidates who have “some degree of maturity and life experience” and there is a correlation between age and maturity. Id. at 267, The age limitation, therefore, was" directly related to the nature of the State’s interest. Id. at 267-68.
Here, Missouri’s “temporary” voter registration requirement is comparable to the “temporary” restriction stricken in Henderson and is just as great a burden on the rights of Voters as are other stricter durational restrictions on other fundamental rights that, for similar reasons have been held unduly burdensome. See, e.g., Shapiro, 394 U.S. at 627, 638, 89 S.Ct. 1322 (1969); Memorial Hospital, 415 U.S. at 251, 94 S.Ct. 1076. Further, like in Henderson, the two-year voter registration requirement denies access to anyone who has failed to register-to'vote more than two years before the next election, and imposes a ban on running for office that has no exceptions and “absolute in its operation” during that two-year period.
Pursuant to the test set forth in Cele-brezze, this Court therefore must turn to consider the “precise interests put forward by the State as justifications for the burden imposed by [this] rule.” 460 U.S. at 789, 103 S.Ct. 1564. It then must “determine the legitimacy and strength of each of [the State’s] interests ... [and] must Consider the extent to which those interests make necessary to burden the plaintiffs rights.” Id. “Only after weighing all of these factors is the reviewing court in a position to decide whether -the challenged provision is unconstitutional.” Id. As explained below, this analysis shows that this burden is not necessary to protect Missouri’s identified interest in requiring two-year voter registration for .potential state representatives — to ensure serious and committed candidates.

C. The Interests Identified by the State In Having Civic-Minded Citizens Run for Office are Not Furthered by the Two-Year Voter Registration Restriction

Respondent argues in his brief that the. two-year voter registration restriction ensures that Missouri’s “State Representative- candidates are serious, committed to the electoral process, and exhibit a meaningful interest in public affairs. Encouraging would-be candidates to participate in elections furthers this compelling state interest.” The State similarly argues in its brief that “disqualifying candidates failing to meet the two-year voter registration requirement is to ensure that office holders have an established stake in the administration of government in the community they seek to represent.”
While having candidates who are serious and committed to the electoral process and *283 have an established stake in the administration of local government may be desirable, surely the State is not suggesting that it could constitutionally limit the ability to run for office to only those persons who display those characteristics, which are located nowhere in Missouri statutes, nor set out in the Missouri Constitution. Indeed, while all citizens may wish their fellow voters and elected officials to display these characteristics, if proof that elected officials actually display such characteristics were required, then there would be an abundance of cases brought throughout the courts of this and every state as candidates contested whether their opponents adequately displayed these civic virtues.
Even if it were a legitimate state goal to limit candidates to those who show serious commitment to public affairs, however, the State has failed to show that to meet that goal it is necessary to burden a potential candidate’s rights, and potential voters’ rights, by prohibiting people from running for state representative' unless they have been registered to vote for two years.
Why is registration any more relevant to guaranteeing a committed and civic-minded representative than would be other far stronger indicators of public mindedness, such as testifying about public issues, demonstrating for or against public issues of the day, being active in the League of Women Voters, working for a candidate for election, or any of a dozen other indicators of civic pride and interest? A person can register to vote without engaging in any of these or any other type of civic involvement, participation in community activities, or even interaction with any members of the community. Certainly the State did not present any evidence that the mere act of voter registration leads to further civic involvement.
Indeed, as the State notes, only a third of registered voters even vote at all. Yet, the State did not condition running for office on actually voting, but only on having circumnavigated the bureaucratic process sufficiently to register, a task that the State suggests is very simple to accomplish. How, then, does completing the registration forms provide necessary proof that one is qualified to be a state representative?
The Fifth Circuit rejected just such irrelevancies in striking down the three-year durational voter requirement in Henderson, stating that the “three year ‘qualified voter’ requirement ... goes beyond the necessary power of the state to prescribe minimal candidate qualifications and denies appellant ... rights secured by the Equal Protection Clause of the Fourteenth Amendment.” 526 F.2d at 293 (emphasis added). Indeed, Henderson noted the irony of such a durational registration requirement as it pertained to the plaintiff, who had lived in the community he sought to represent for 13 years: “The importance of this distinction — between residency and registration — is no more amply demonstrated than by the fact that appellant Henderson has been a resident of the Fort Worth School District for thirteen years, but will still be ineligible as a candidate in the 1976 election.” Id. at 290.
Board of Sup’rs of Prince George’s Cnty. v. Goodsell, 284 Md. 279, 396 A.2d 1033, 1039 (1979), rejected a similar argument, holding that “[t]he Board has suggested no relationship between mere registration and ‘awareness of the County.’ And we can perceive little additional familiarity a longtime resident of the County would have with local issues simply by being registered to vote.” (Emphasis added).
For these same reasons, Missouri’s requirement that potential candidates be registered to vote for two years is not *284 necessary to achieve its interest in having serious, committed candidates. Indeed, the State itself recognizes that a durational voter registration requirement is not necessary to identify those who are qualified for public office, for no State-level public office other than the office of State Representative has a two-year registration -requirement. While the office of State Senator requires a three-year registration, and some state judicial seats require nine-year registration, the candidate could run for Governor, Lieutenant Governor, Attorney General, Secretary of State, and State Auditor without ever having been registered to vote; and run for a host of other state and local offices by simply, registering to vote at the time of the election.
Similar inconsistency in imposing a supposedly “necessary” registration requirement has led other courts to conclude that a registration restriction imposes an unnecessary burden on voting rights and so to invalidate their respective durational voter registration requirements. The New Jersey Supreme Court, in Gangemi v. Rosengard, 44 N.J. 166, 207 A.2d 665, 669 (1965), for instance, said that if registering to vote for a certain period ensures qualified candidates, why did the requirement not apply to candidates for Governor, Senator, or Assemblyman? Similarly, in Treiman v. Malmquist, 342 So.2d 972, 976 (Fla. 1977), the Florida Supreme Court found noteworthy “the fact that this restriction applies solely to candidates for judicial office. No such similar restraint is placed on candidates for any other political office.” Id.
The State makes the similar argument that it “can rationally conclude that the legislature is better served by someone who took the time necessary to at least become eligible to vote for who should serve the current term.” But, the discussion is about being qualified to run not for the current term but for the next term after registration. Why is such a long registration requirement a necessary burden on Ms. Johns’ and voters’ rights? .Why is it not up to the voters to determine by their votes whether they value whatever character trait may be shown by registering earlier than one’s opponent? While registration to vote may say something about knowledge of the voting process, it is far less relevant than, many other actions or characteristics, and could not be considered to impose a necessary burden to elect a responsible legislator.
It was for these reasons that in Cele-brezze itself the Supreme Court rejected a very similar argument. In that case, an Ohio statute required all independent candidates to register by March to be placed on the November ballot. 460 U.S. at 794, 103 S.Ct. 1564. Ohio argued that this requirement promoted informed voters by giving voters time to educate themselves about otherwise unknown independent candidates. Id. at 796, 103 S.Ct. 1564. But the Supreme Court held that, far from educating voters, “A State’s claim that it is enhancing the ability of its citizenry to make wise decisions by restricting-the flow of information to them must be viewed with some skepticism,” Id. at 798, 103 S.Ct. 1564. It further noted that “the best means [to educate voters],is to open the channels of communication rather than to close them[ ]” through arbitrary restraints. Id.
Similarly, in Goodsell the Maryland Court of Appeals rejected an argument that a durational voter registration requirement ensured candidates had an awareness of the county they wished to serve and prevented “frivolous candidates” from running for office. 396 A.2d at 1039. Goodsell held that “in a democracy, the appropriate judges of which candidates are frivolous, and which candidates have the *285 greater commitment to the County, are the voters on election day.” Id. (Emphasis added)
Finally in Gangemi the New Jersey Supreme Court refused to uphold a dura-tional voter registration requirement because “individual fitness is something the voters decide and the intensity of a candidate’s interest is part and parcel of that subject. The Legislature cannot take that issue from them. [The two-year voter registration requirement] would do so; it is therefore invalid.” 207 A.2d at 669 (emphasis added).
So too here, the State would argue that this restriction on would-be candidates promotes qualified, involved, and committed candidates. But, just like in Cele-brezze, Goodsell, and Gangemi restricting the rights of candidates and voters simply because the candidate did not register to vote more than two years prior to an election is not necessary to produce high-quality candidates for state representative. Neither is there any constitutional basis for making a candidate’s level of civic engagement and commitment a requirement to run for office as opposed to a personal characteristic that can be brought up as a natural part of a competitive race, challenged by the opponent and debated vigorously.
Weighing the burden placed on Ms. Johns and voters against the strength and legitimacy of Missouri’s interests, the two-year voter registration requirement is not necessary to achieve these interests and, therefore, places a substantial burden on the First and Fourteenth amendment rights of Ms. Johns and voters. Finding that this restriction imposes a substantial burden, strict scrutiny must be applied, and this burden does not pass strict scrutiny. See Norman, 502 U.S. at 289, 112 S.Ct. 698.
II. The Durational Voter Registration Restriction Is Invalid Whether Subject to Strict or Rational Basis Scrutiny
The State itself conceded at oral argument that the two-year registration requirement cannot stand if it is subjected to strict scrutiny. This is because the State has no compelling interest in precluding voters from considering otherwise qualified candidates simply because they have been registered to vote for only one year, or in the case of Ms. Johns, until she has been registered for 45 months, rather than for two years. Moreover, even if ensuring serious and committed candidates with a stake in the community they wish to serve was a compelling interest, a two-year voter registration is not a narrowly-tailored way to accomplish this goal. This law simply does not pass strict scrutiny. For these reasons, I would hold the two-year registration requirement invalid;
Even applying rational basis review, however, this arbitrary two-year durational voter registration requirement should be held unconstitutional. The very issues discussed above in analyzing why the registration requirement imposes a substantial burden demonstrate why that burden also is arbitrary and irrational. In fact, although Missouri has not had occasion to consider whether there is a rational basis for such a durational voter registration requirement, similar restrictions have been challenged around the country and have not withstood constitutional review. See, e.g., Gangemi 207 A.2d 665 (1965); Treiman, 342 So.2d 972 (Fla. 1977); Goodsell, 396 A.2d 1033 (1979).[1]
*286 The high courts in at least two states have held that, even under a rational basis standard, these types of durational voter registration requirements are invalid. In Gangemi, the New Jersey Supreme Court could not even “conceive a rational connection between the supposed aim of the [registration requirement] and class of municipalities to which its operation is limited.” 207 A.2d at 670. Similarly, in Tra-man, the Florida Supreme Court held that even a one-year voter registration requirement “does not serve any reasonable or legitimate state interest. It does not in any way protect the integrity of the election process or purity of the ballot; it does not serve to keep the ballot within manageable limits. Thé barrier it erects is an unnecessary restraint on one’s right to seek elective office.” 342 So.2d at 976 (emphasis added).
In Goodsell, although the court struck down a five-year voter registration requirement using strict scrutiny analysis, it implied that even under a rational basis test, it could not perceive a relationship between the restriction' and the state’s interest, stating: “The Board has suggested no relationship between mere registration and ‘awareness of the County.’ And we can perceive little additional familiarity a long-time resident of the County would have with local issues simply by being registered to vote.” 396 A.2d at 1039 (emphasis added). Registering to vote two years prior to the election simply does not further the interest of assuring that individual candidates will be any more qualified, serious, or committed than those who have not,
Rather than promoting qualified candidates,' the two-year voter registration requirement punishes those individuals who had not previously been involved in public service but who may have been inspired to run for political office and register to vote within two years of an election, by eliminating them from contention in the upcoming election. Far from “encouraging would-be candidates to participate in elections,” the durational voter registration requirement-may dissuade would-be candidates from running in the next election because the candidate did not sign a voter registration application within, the two-year requirement. Indeed, if .citizens in a particular district are roused by the words of a would-be candidate during the years preceding an election but are prohibited from voting for that candidate, it may deter them from voting or participating in future elections, thwarting the‘State’s interest in encouraging civic involvement.
Further, to the extent that the two-year voter registration provision requires registration in Missouri, it is a restriction on the right to travel and so would be subject to strict scrutiny and should be invalidated on that basis. It certainly is not narrowly tailored to the asserted state interest in having candidates show an interest in the electoral process. See, e.g., Saenz v. Roe, 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999).
In fact, though, there may be no travel restriction imposed by the registration requirement, for neither article III, section 4 nor section 21.080 require that the candi *287 date seeking office have been registered in Missouri for the two-year period prior to the election at which they wish to run for office. These laws require only that the would-be candidate be' a “qualified voter,” which has been interpreted to mean ’“registered voter.” See State ex rel. Burke v. Campbell, 542 S.W.2d 355, 358 (Mo.App.1976). They do not require the candidate to be a “qualified voter of this state.” Of course, to actually take office the candidate would have to actually reside in the district the candidate seeks, to represent and would have had to change registration at some point, but that does not apply to the entire two-year period in question.
If the statute and constitution simply were silent as to where one must be registered, it might be logical to infer that the registration must have to be in Missouri for the full period of time nonetheless. But, the legislative history in this area does not permit such an inference. As the majority notes the Missouri constitution originally required a .state representative to be a “qualified voter of this state two years.” Mo. Const, art. TV, sec. Ill (1865) (emphasis added). But, the words “of this state,” were removed from the 1945 constitution. Mo. Const, art. Ill, sec. 4 (1945). A purpose must be inferred from such a language change, and the only one that seems to exist is that the people wanted a potential candidate to qualify under Missouri law to run for state representative even if registered in an entirely different state for most of the prior two-year period.
The majority claims the lack of requirement that the registration be in Missouri shows that the voter registration requirement had little to do with residency, and simply is concerned with social and civic engagement. But, why would a candidate’s civil arid social engagement in another state bear any rational relationship to whether the candidate is qualified to run for state representative in Missouri'?
Perhaps for this reason, the State’s and Respondent’s briefs make clear that they believe that it is engagement in Missouri’s political system that is relevant. Respondent noted in his brief: “Because Missouri’s general elections occur once every two years, Art. Ill, Sec. 4 encourages would-be State Representatives to:register to vote and participate in the. electoral process before running for that office.” And the State noted: “the rational purpose for. temporarily disqualifying candidates failing to meet the two-year voter registration requirement is to ensure that office holders have an established stake in the administration and in the community they seek to represent.” Yet, allowing registration in another state would not serve either of these goals.
Far more relevant to showing commitment to the community the candidate seeks to represent is the requirement of a one-year residency in the district to run for office. See Mo. Const., art. Ill, sec. 4 and § 21.080. That requirement does at least ensure that the person have experience in the community the person seeks to represent. Indeed, even if a limitation to registration in Missouri were read into the registration requirement, it is uncontested that neither the constitution nor any statute requires that the registration be in the community in which the person is running for office. The candidate could register in Kansas City and then run for office in and vote in Ferguson if the one-ye’ar residency requirement were met so long as the candidate’s registration was transferred to the local district. The State’s argument then, that it has an interest in having candidates who at least have some “established stake” in their community, evaporates if thé two-year voter register requirement is satisfied by a candidate who has not been registered for two years in the community the candidate seeks to serve.
*288 ■For these reasons, as well as the reasons considered earlier in addressing whether the burden is a substantial one, I would hold that the two-year durational voter registration requirement is unconstitutional. I believe that it places a substantial burden on the First and Fourteenth amendment rights of Ms. Johns and voters and is not narrowly-tailored to achieve the State’s purported interest in promoting civic education and ensuring candidates who have an “established stake” in their community. But, even if this Court were correct in applying rational basis review, Missouri’s two-year voter registration requirement is not rationally related to a legitimate state interest. I therefore dissent.

. While some of these cases have been decided on equal protection grounds, the courts’ analysis of the validity of durational voter registration requirements are still relevant *286 here for this same reasoning applies to Ms. Johns’ arguments concerning restriction of her rights and those of the voters. In her cross-motion for judgment on the pleadings Ms. Johns did raise the effect of these restrictions on her Fourteenth Amendment equal protection rights, but the majority holds she did not do so sufficiently to preserve the separate equal protection argument because she did not specifically state this was an alternative ground for relief. There is no point in undertaking a separate equal protection analysis here, other than to state that Ms. Johns raises very serious equal protection arguments.